J-A26024-20

2021 PA Super 4

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
   :          PENNSYLVANIA
   :
        v.                       :
   :
   :
JAMAL WALLACE                     :
   :
         Appellant          :    No. 2427 EDA 2019

Appeal from the Judgment of Sentence Entered May 23, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0004008-2018

BEFORE:    BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

OPINION BY LAZARUS, J.:                  **FILED: JANUARY 8, 2021**

Jamal Wallace appeals from the judgment of sentence, entered in the Court of Common Pleas of Montgomery County, after a jury convicted him of aggravated assault—serious bodily injury,[1] criminal conspiracy,[2] persons not to possess a firearm,[3] and carrying a firearm without a license.[4] Upon careful review, we affirm.

The trial court summarized the facts of this case as follows:

On April 6, 2018, the Norristown Police Department responded to a shooting in the area of Spruce and Willow Streets in Norristown,

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2702(a)(1).

[2] 18 Pa.C.S.A. § 903.

[3] 18 Pa.C.S.A. § 6105.

[4] 18 Pa.C.S.A. § 6106.

Montgomery County. Officers obtained video footage from several locations around the area of the shooting. Video surveillance from Pub Deli depicted [Wallace] and co-[d]efendant Mason Clary [] together during the hours leading up to the shooting. . . . [Wallace] and Clary were first seen there at approximately 5:03 p[.]m[.] From that time until approximately 8:04 p[.]m[.], video surveillance showed [Wallace] and Clary in and out of [] Pub Deli. The video shows them inside [] Pub Deli for periods of time, then leaving and returning throughout the late afternoon/early evening. Each time [Wallace] was at Pub Deli, he was with Clary.

During the time they were at Pub Deli, at approximately 6:04 p[.]m[.], [Wallace] went to a vehicle parked just outside the store and retrieved a firearm from the glovebox. He racked the chamber of the gun and placed the loaded firearm in the waistband of his pants. [Wallace] then went back inside [] Pub Deli with the firearm in the right side of his waistband. His shirt was pulled up above his pants so that a portion of the firearm was visible. Clary remained inside [] Pub Deli while [Wallace] was outside retrieving the firearm. When [Wallace] came back inside [] Pub Deli, the firearm was visible in his waistband and Clary motioned to him to put his shirt down to cover the firearm. [Wallace] pulled his shirt down over the waistband of his pants to cover the firearm, and the firearm created a visible bulge on his right side where it was located. There is no evidence that [Wallace] thereafter relinquished possession of the firearm.

[Wallace] and Clary left [] Pub Deli together for the last time at approximately 8:04 p[.]m[.] At that time[,] they went to the home of a minor, C.S., . . . and arrived there at 8:13 p[.]m[.] [C.S.]'s home backed up to Clary's home. The three individuals then left C.S.'s house together at 8:16 p[.]m[.], and walked to the intersection of Spruce and Willow Streets in Norristown, which is located approximately three blocks from C.S.'s home. At this intersection, a pedestrian, later identified as the victim, Kamal Dutton, [] walked past the trio. [Dutton] was walking down the street, minding his own business[,] at the time he passed the trio of [Wallace], Clary, and C.S.

For no apparent reason, after [Dutton] walked past the trio, the three individuals turned around and confronted him together. The trio surrounded [Dutton] in a circular manner, each standing a few feet away from [him] and each other. The trio then started to fight with [Dutton], three on one. [Wallace] pulled out a firearm and pointed it at [Dutton] in full view of his fellow conspirators.

As [Dutton] started to run away from the trio, they chased him, together, running east on Spruce Street toward DeKalb Street. As the trio chased [Dutton], [Wallace] fired multiple shots at him, ultimately striking him in the head. The trio of conspirators turned and quickly ran away together. The shooting occurred at approximately 8:21 p[.]m[.] After the shooting, the three individuals fled the scene together, leaving the victim bleeding on the ground.

Officer Kevin Fritchman, of the Norristown Police Department, found [Dutton] with a gunshot wound to the head . . . approximately three blocks from the scene of the shooting on Spruce Street. Police located a number of blood droplets [and four 9 mm shell casings] on Spruce Street at the scene of the shooting. . . . After the shooting, [Dutton] identified [Wallace] as one of the individuals involved in the attack by circling his photograph in a photo array.

At the time of the shooting, C.S. was a seventeen (17) year[-]old juvenile. Based upon the offense, Norristown police filed charges against him for his role in the conspiracy and assault. Eventually, C.S.'s case was decertified to Juvenile Court and he entered an admission to conspiracy to commit aggravated assault. [C.S.] identified [Wallace] and Clary as the two men he conspired with to assault the victim. He admitted that the trio acted in concert to assault the victim.

[In addition, a]t the time of the shooting, Clary wore a [Global Positioning System] (GPS) monitoring device on his ankle. Based upon data recovered from the GPS device, [] Clary was identified as being present at [] Pub Deli with [Wallace] before the assault and leaving [] Pub Deli approximately twenty minutes before the attack. The GPS data also identified [] Clary near the home of C.S. immediately before the crime, at the location of the crime, and then tracked back to the area near his and C.S.'s homes after the crime. On April 7, 2019, approximately twenty-four (24) hours after the shooting, Clary cut off his GPS monitoring device. The GPS data was corroborated by video surveillance.

Trial Court Opinion, 10/21/19, at 3-7.

On May 3, 2018, the Norristown Police Department filed a criminal complaint charging Wallace with the above-stated crimes. On October 29,

2018, the trial court ordered that Wallace's case be consolidated with co-defendant Clary's case. On March 7, 2019, following trial, a jury convicted Wallace of each charge. On May 23, 2019, the trial court imposed the following, consecutive sentences: ten to twenty years' imprisonment for aggravated assault—serious bodily injury; ten to twenty years' imprisonment for criminal conspiracy to commit aggravated assault; ten to twenty years' imprisonment for persons not to possess a firearm; and two to five years' imprisonment for carrying a firearm without a license, for a total sentence of thirty-two to sixty-five years' imprisonment.

On June 3, 2019, Wallace timely filed a post-sentence motion, which the court denied on August 12, 2019. On August 20, 2019, Wallace timely filed a notice of appeal to this court, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following issues for our review:

1. Whether the trial court erred in permitting the Commonwealth to display inflammatory photographs (marked C1 and C2) of [Dutton]'s injuries because the prejudice caused by the photographs substantially outweighed any relevance that they could have had in a case where [Dutton] testified in detail [as] to his injuries and the treating physician also described [his] injuries.

2. Whether the trial court erred in permitting the Commonwealth to introduce co-defendant Clary's GPS records because the records were hearsay which did not qualify as a business record because they were prepared in anticipation of litigation and therefore did not qualify for the business records hearsay

exception pursuant to [Pennsylvania Rule of Evidence] 803(6).[5]

3. Whether the trial court erred in denying the jury's request to see [Dutton's] statements to police during deliberations where the statements had been admitted into evidence, were relevant, and were wildly inconsistent, and the co-defendant had conceded identification.

4. Whether the trial court erred in convicting [Wallace] of conspiracy because the evidence failed to show any prior agreement to commit a crime and instead showed[,] at most[,] that the defendants participated in an unplanned, spontaneous incident.

5. Whether the trial court erred in denying the post-sentence motion for a new trial because the verdict was against the weight of the evidence for each charge in that the identification of [Wallace] as the shooter was so questionable as to shock the conscience because the only identification of [Wallace] came from a co-defendant who had admitted to the charges in Family Court in exchange for favorable treatment and who denied identifying [Wallace] in his live testimony, and [Dutton] had repeatedly failed to identify [Wallace].

6. Whether the trial court imposed a sentence which was excessive, unreasonable, and an abuse of discretion in light of the mitigation evidence presented by [Wallace] regarding [his] background[] and the nature of the offense.

7. Whether the trial court erred in "double-counting" [Wallace's] prior criminal convictions and adjudications as its basis for departing from the guidelines because [Wallace]'s prior record was already factored into the applicable guideline range.

Brief of Appellant, at x-xii (reordered for ease of disposition).

_____

[5] In his appellate brief, Wallace baldly asserts at the end of this argument that evidence of his association with someone on GPS monitoring "constitute[s] impermissible character evidence or prior bad acts evidence" against him. Brief of Appellant, at 9. This argument is waived because Wallace did not include it in his Rule 1925(b) statement. *See Commonwealth v. Hill*, 16 A.3d 484, 492 (Pa. 2011) (issues not raised in Rule 1925(b) statement will be deemed waived).

In his first two issues on appeal, Wallace challenges evidentiary rulings made by the trial court. Our standard of review is well-settled:

> In reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill[-]will[,] or partiality, as shown by the evidence of record. Furthermore, if in reaching a conclusion the trial court [overrides] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Thompson*, 106 A.3d 742, 754 (Pa. Super. 2014) (internal citations and quotation marks omitted).

Wallace first claims that the trial court committed reversible error by allowing the jury to view two photographs of Dutton's shooting injuries. Specifically, he argues that the prejudice caused by the allegedly inflammatory photographs substantially outweighs their probative value, because Dutton and his treating physician both testified regarding Dutton's injuries. No relief is due.

A trial court must engage in a two-step analysis when considering the admissibility of photographs. "First, a trial court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts." *Commonwealth v. Haney*, 131 A.3d 24, 37 (Pa. 2015) (internal citation omitted); *see also Commonwealth v. Funk*, 29 A.3d 28, 33 (Pa. Super. 2011) (en banc)

(photograph inflammatory if it is "so gruesome it would tend to cloud the jury's objective assessment" of defendant's guilt or innocence).[6]  If the photograph is inflammatory, the trial court must decide whether or not the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.  **Haney**, **supra** at 37.  "[T]he fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant."  **Id.**

Instantly, the trial court determined, after reviewing the photographs and hearing argument on Wallace's motion *in limine*, that neither of the two photographs at issue were inflammatory.  Indeed, the court explained that:

> They are not gruesome.  They are not overly bloody.  . . . **[T]here's nothing about those photographs that the [c]ourt believes would actually inflame the passions and prejudices of a jury.**  They are what this [c]ourt would consider typical photographs in a shooting case.  There are only two of them.  **They are certainly relevant to establish the chain of events and injury that was caused**, all of which the Commonwealth is required to prove.  So[,] to the extent that one might disagree and find that they are, in fact, inflammatory, this [c]ourt finds that **they are so essential to the Commonwealth's case that their relevance outweighs any potential inflammatory nature**.

N.T. Pretrial Motions Hearing, 3/4/19, at 97-98 (emphasis added).

Furthermore, the trial court instructed the jury, before viewing the photographs, that it was not to allow the nature of the photographs to impact its decision in the case, further guarding against any unfair prejudice.  **See**

---

[6] Wallace does not dispute the relevance of the photographs, only whether or not they are inflammatory.  **See** Brief of Appellant, at 5-6.

N.T. Jury Trial, 3/5/19, at 27; *see also Commonwealth v. Pruitt*, 951 A.2d 307, 319 (Pa. 2008) (although possibility of inflaming passions of jury is not to be lightly dismissed, trial judge can minimize danger with appropriate instruction, warning jury members not to be swayed emotionally by disturbing images, but to view them only for their evidentiary value).

Because the trial court articulated a reasonable basis for finding that the photographs were not inflammatory, and further demonstrated its fairness, good-faith, and impartiality by issuing a cautionary instruction to the jury, the trial court properly exercised its discretion in admitting the two photographs of Dutton's injuries to support Wallace's aggravated assault—serious bodily injury charge. *Haney*, *supra*; *Thompson*, *supra*.

Next, Wallace argues that the trial court erred by admitting Clary's GPS records into evidence, claiming that they constitute inadmissible hearsay. This claim is meritless.

Hearsay is defined an out-of-court statement offered to prove the truth of the matter asserted. Pa.R.E. 801(c). Under the Pennsylvania Rules of Evidence, a "statement" is defined as "**a person's** oral [or] written assertion, or nonverbal conduct, if the **person** intended it as an assertion." Pa.R.E. 801(a) (emphasis added). Generally, hearsay is not admissible, as it "lacks guarantees of trustworthiness fundamental to [our] system of jurisprudence." *Commonwealth v. Smith*, 681 A.2d 1288, 1290 (Pa. 1996). In order to guarantee trustworthiness, the proponent of a hearsay statement must establish an exception to the rule against hearsay before it shall be

admitted. *Id.* One such exception includes records of a regularly conducted business activity. *See* Pa.R.E. 803(6). Pursuant to that exception, a "memorandum, report, or data compilation in any form" detailing an "act, event[,] or condition" qualifies as an exception to the rule against hearsay where:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of regularly conducted activity of a "business," which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) neither the source of information nor other circumstances indicate a lack of trustworthiness.

*Id.*

To date, Pennsylvania courts have not ruled on whether GPS records are hearsay. However, some state and federal courts have ruled that computer-generated GPS data cannot be deemed hearsay because it is an assertion made by a **machine**, not an assertion made by a **person**. *See*, *e.g.*, *U.S. v. Lizarraga-Tirado*, 789 F.3d 1107, 1109-10 (9th Cir. 2015) (holding GPS coordinates generated by Google Earth program are not hearsay because "[t]he program analyzes the GPS coordinates and, **without any human intervention**, places a labeled tack on the satellite image. Because **the**

**program makes the relevant assertion**—that the tack is accurately placed at the labeled GPS coordinates—there's no statement as defined by the hearsay rule") (emphasis added); ***U.S. v. Khorozian***, 333 F.3d 498 (3d. Cir. 2003) (holding date stamp on fax not hearsay because, under Federal Rules of Evidence, a "statement" is something "uttered by a 'person,' so **nothing 'said' by a machine is hearsay**") (ellipses removed, emphasis added); ***People v. Rodriguez***, 16 Cal. App. 5th 355, 381 (Cal. Ct. App. 2017) (holding GPS coordinates automatically generated from defendant's ankle monitor not hearsay under California Evidence Code because "**there was 'no statement being made by a person'**") (emphasis added); ***Wisconsin v. Kandutsch***, 799 N.W.2d. 865, 879 (Wis. 2011) (distinguishing between computer-stored and computer-generated reports, and finding computer-generated report from defendant's electric monitoring device not hearsay "[b]ecause the report was generated as 'the result of an **automated process free of human intervention**.'") (emphasis added).

In arguing that computer-generated GPS records qualify as hearsay, Wallace points to a single case from Florida, ***Channell v. State***, 200 So.3d 247, 248-49 (Fla. Dist. Ct. App. 2016). There, the court found that the data recorded from a defendant's GPS monitoring device was "'clearly hearsay' because it purported . . . to prove that [the defendant] was in the location . . . as reflected in the GPS data." ***Id.***; ***see*** Brief of Appellant, at 7-8. Wallace insists, "[t]his Court should adopt Florida's position and hold that GPS records qualify as hearsay." Brief of Appellant, at 8.

- 10 -

Wallace fails to acknowledge that the relevant definitions framing the hearsay analysis are materially different under the Florida Evidence Code and the Pennsylvania Rules of Evidence. Under section 801(a)(1) of Florida's Evidence Code, a "statement" is defined, for hearsay purposes, simply as "[a]n oral or written assertion." 801 Fla. Stat. Ann. §90.801. Thus, under Florida's definition, any written assertion would qualify as a "statement," regardless of who (or what) is making the assertion.

In contrast, as explained above, the Pennsylvania Rules of Evidence expressly define a "statement" for purposes of hearsay as the written or oral assertion of **a person**. Pa.R.E. 801. For this Court to "adopt Florida's position and hold that GPS records qualify as hearsay," *see* Brief of Appellant, at 8, we would have to ignore the evidentiary definitions of Pennsylvania law, which we cannot do. ***See Commonwealth v. Brown***, 52 A.3d 1139, 1176 (Pa. 2017) ("[I]n interpreting the meaning of the Pennsylvania Rules of Evidence, [our Supreme Court] ascribes to the words of those rules their plain and ordinary meaning[.]"). Any change in the Rules of Evidence must be effectuated by our Supreme Court. Thus, we conclude that, as it stands, GPS data automatically generated by a computer, free from interference by any

person, does not constitute a "statement," and therefore, cannot qualify as hearsay. *See* Pa.R.E. 801.[7] Accordingly, Wallace's argument fails.[8]

Next, Wallace claims that the court erred by denying the jury's request to see Dutton's statements to police during deliberations. No relief is due.

Pursuant to Pennsylvania Rule of Criminal Procedure 646, "[u]pon retiring, the jury may take with it **such exhibits as the trial judge deems proper**, except as provided in paragraph (C) [delineating which materials the jury shall not be permitted to have]." Pa.R.Crim.P. 646 (emphasis added). "The recognized reason for excluding certain items from the jury's deliberations is to prevent the jury from placing undue emphasis or credibility on the material sent back with the jury and de-emphasizing or discrediting other items not in the room with the jury." *Commonwealth v. Creary*, 201 A.3d 749, 753 (Pa. Super. 2018).

When considering materials that are not expressly prohibited under section 646(C), the question of "[w]hether an exhibit should be allowed to go out with the jury during its deliberation is within the sound discretion of the trial judge." *Commonwealth v. Barnett*, 50 A.3d 176, 194 (Pa. Super.

---

[7] Because we conclude that the challenged evidence does not constitute hearsay, we need not address whether it falls within an exception to the rule against hearsay.

[8] Because Wallace has not challenged the methodology by which the GPS data was created, that issue is not presently before us. However, we leave open for future discussion the possibility of excluding such evidence where an opponent challenges the procedure for generating it, such as by demonstrating an error with the machine, software, or server that collects, processes, interprets, or displays the data.

2012). This decision "cannot be overturned absent an abuse of discretion." *Id.* *See also Commonwealth v. Lane*, 424 A.2d 1325, 1328 (Pa. 1981) (trial court will not be found to have abused its discretion unless record discloses judgment exercised is manifestly unreasonable, or result of partiality, prejudice, bias, or ill-will).

During its deliberations, the jury requested that the trial court send back "all of [] Dutton's statements" to police, which were contained in Commonwealth's Exhibits 23, 24, and 25. N.T. Jury Trial, 3/7/19, at 58-59. The trial court discussed the jury's request with the parties and sought counsel's input before making its decision. Counsel for the Commonwealth and co-defendant Clary were in agreement with the trial court that none of the statements should be sent back because at least one statement contained evidence that was held to be inadmissible at the pre-trial suppression hearing. Counsel for Wallace objected to the trial court's decision not to send the exhibits back. The exchange proceeded as follows:

> The Court: [The jury] also requested [] Dutton's statement[s]. The Court has three of them, three exhibits. Commonwealth's Exhibit 23 and 24 are potentially able to be sent, but **Commonwealth's Exhibit 25 is problematic.**
>
> In reviewing Commonwealth's Exhibit 25, **there are multiple references in here to evidence that was held to be inadmissible by the [c]ourt**. **It was the subject of the suppression hearing, the identification of [] Clary that was not presented in court**. In fact, the Commonwealth was permitted to lead the witness to avoid getting into that. So I do not believe it is appropriate in any way to send Commonwealth's Exhibit 25 out because there are so many references to the second individual. But I want to hear from all of you.

- 13 -

[Counsel for the Commonwealth]:  From our perspective, Judge, we agree that C-25 can't go back.  Because of that, it is our position that none of the statements should go back.  It would probably be more problematic to send some and not all of them.  So from our perspective, none of them should go back, and we would ask the jury to rely on their recollection [of] the testimony in court.

The Court:  All right.  Mr. Quigg?

[Counsel for Clary]:  I'm in agreement with Mr. Fancher.

The Court:  Mr. Armstrong?

[Counsel for Wallace]:  Your Honor, on behalf of Mr. Wallace, we believe that all three statements should go back.  I understand the problem with Mr. Quigg's client and the issues in that one statement, but that's not my problem, and it's not Mr. Wallace's problem.  We would respectfully object to the decision of the [c]ourt not to send all three out.

The Court:  I certainly understand your objection, but **as a practical matter, I cannot send C-25 back because it implicates evidence that was not presented to the jury**, and it would be entirely inappropriate and prejudicial to Mr. Clary.

And I agree with Mr. Quigg and Mr. Fancher that if I can't send one, I should not send any, because I think that does pose more problems than it solves.  So I will not send any of those statements.

N.T. Jury Trial, 3/7/19, at 59-61 (emphasis added).

Instantly, Wallace baldly asserts in his appellate brief that the trial court's decision constitutes reversible error, without citing any case law to support his claim, and without raising any argument that the trial court's decision is manifestly unreasonable or the result of bias, partiality, prejudice, or ill-will.  *See* Brief of Appellant, at 3-5.  Upon our review, we discern no abuse of discretion where the trial court recognized, as a practical matter, that

- 14 -

sending part but not all of the requested evidence would be problematic, and declined to re-present evidence to the jury that alluded to evidence previously held inadmissible. ***Barnett***, ***supra***; ***Lane***, ***supra***.

Wallace next challenges the sufficiency of the evidence with regard to his conviction for criminal conspiracy. He claims that "the evidence failed to show any prior agreement to commit a crime." Brief of Appellant, at 3. Wallace maintains that the evidence shows, at most, "that [he and Clary] became involved in an argument with [Dutton] and the argument quickly escalated into a fight." ***Id.*** We disagree.

Our well-settled standard of review when evaluating a challenge to the sufficiency of the evidence is as follows:

> [W]e assess the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict-winner. We must determine whether there is sufficient evidence to enable the fact[-]finder to have found every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Dunphy*, 20 A.3d 1215, 1219 (Pa. Super. 2011) (quoting *Commonwealth v. Evans*, 901 A.2d 528, 532-33 (Pa. Super. 2006)).

A criminal conspiracy conviction requires proof of the following: "(1) an intent to commit or aid in an unlawful act, (2) an agreement with a co-conspirator[,] and (3) an overt act in furtherance of the conspiracy." *Commonwealth v. Thomas*, 65 A.3d 939, 943 (Pa. Super. 2013). "Because it is difficult to prove an explicit or formal agreement to commit an unlawful act, such an [agreement] may be proved inferentially by circumstantial evidence, i.e., the relations, conduct[,] or circumstances of the parties or overt acts on the part of the co-conspirators." *Id.* It is proper for the Commonwealth to establish the conspiracy by proof of acts and circumstances subsequent to the crime. *Commonwealth v. Kelson*, 3 A.2d 933, 935 (Pa. Super. 1939).

Wallace submits that his case is "directly on point" with *Commonwealth v. Kennedy*, 453 A.2d 927 (Pa. Super. 1982), where this Court reversed the appellant's conspiracy conviction, finding that the evidence showed only that two men became involved in an argument with the complainant, which escalated into a fight. In *Kennedy*, the defendant asked Williams, a guest in his apartment, to alert his landlord downstairs that the electricity in the apartment had returned. After thirty minutes, when Williams did not return, Kennedy went downstairs to find him arguing with the landlord; after Williams struck the landlord, "an affray ensued which continued into [the landlord]'s apartment," where Kennedy and Williams viciously beat him. *Id.*

- 16 -

at 927-29. With regard to his conspiracy conviction, this Court explained that "persons do not commit the offense of conspiracy when they join into an affray spontaneously, rather than pursuant to a common plan, agreement, or understanding." *Id.* at 930.

> The Commonwealth's evidence clearly established that a brawl occurred in which defendant and Williams were participants. This, however, does not in itself demonstrate the existence of a conspiracy. As the foregoing summary of the evidence . . . reveals, a *mere association* between defendant and Williams was shown, along with their simultaneous participation in the assault[.] **Nothing in the relation, conduct, or circumstances of the parties, however, is indicative of there having been an agreement, explicit or implicit, as to commission of the assault**. The fact that the affray erupted from an argument, the manner in which the beating was inflicted, and **the overt acts of the participants prior to and concurrent with commission of the assault fail to bespeak concert of action indicative of a common design**. Indeed, the evidence reveals only that defendant and Williams became embroiled in an argument with [the landlord], and that this argument immediately escalated into a violent confrontation in which defendant and Williams inflicted beatings upon [him]. These events being perfectly consistent with the presumption that defendant and Williams acted independently and spontaneously, and there being no evidence upon which existence of the common understanding or agreement requisite to the charge of conspiracy might properly be inferred, the verdict of guilt as to conspiracy must be regarded as inadequately supported by the evidence.

*Id.* (emphasis added).

Wallace argues that "the facts of the instant case are identical to those in *Kennedy*." Brief of Appellant, at 2. Moreover, he claims that "there is simply nothing in the record to suggest" any agreement between himself and Clary to harm Dutton. *Id.* We disagree.

- 17 -

In this case, the evidence established that Wallace and his co-conspirator Clary were together for several hours leading up to the shooting, as they were captured on Pub Deli's video surveillance leaving and returning numerous times. The surveillance footage showed that, prior to the unprovoked assault against Dutton, Wallace armed himself and Clary helped him conceal the illegal firearm by alerting him to the fact that it was visible on his person. Wallace and Clary, together, then went to C.S's home, and the trio encountered Dutton near the intersection of Spruce and Willow Streets. The three men, acting in concert, surrounded Dutton, and when Wallace pointed his gun at Dutton's head, C.S. and Clary waited for Wallace to act. As Dutton attempted to flee, the three men, together, chased him. After Wallace fired four shots at Dutton's head, the trio turned and ran together for approximately one block before dispersing from each other and reconvening elsewhere on Willow Street. None of the co-conspirators tried to render aid to Dutton after Wallace shot him.

The facts of this matter are substantially different than those in **Kennedy**. There, the defendant expected Williams to merely relay a message to the complainant, but, having noted Williams' half-hour absence, went to locate him and found him engaged in a confrontation with the complainant and impulsively joined in the fight that Williams started. Conversely, here, the facts and circumstances demonstrate that Wallace and Clary were not acting independently and spontaneously. Wallace's and Clary's interactions and behavior in the hours prior to, during, and after the assault—especially

with regard to obtaining and concealing the illegal firearm—prove, circumstantially, that the men shared a common understanding that an assault would be committed, which, in fact, it was. Accordingly, the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, and allowing for all reasonable inferences therefrom, was sufficient to convict Wallace of conspiracy to commit aggravated assault. ***Thomas***, ***supra***; ***Kelson***, ***supra***.

Next, Wallace raises a challenge to the weight of the evidence for each of his convictions. Specifically, Wallace claims that the evidence identifying him as the shooter, including surveillance footage and the testimony of C.S. and Dutton, "was simply so untrustworthy that the conviction shocks the conscience." Brief of Appellant, at 16. He maintains that he is entitled to a new trial.

Our standard of review for a challenge to the weight of the evidence is well-settled:

> A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question [of] whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a

motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

***Commonwealth v. Cousar***, 928 A.2d 1025, 1035-36 (Pa. 2007).

Moreover, when a weight challenge "is predicated on the credibility of trial testimony, [appellate] review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." ***Commonwealth v. Bowen***, 55 A.3d 1254, 1262 (Pa. Super. 2012). Any conflicts in the evidence or contradictions in testimony are exclusively for the fact-finder to resolve. ***Commonwealth v. Sanders***, 42 A.3d 325, 331 (Pa. Super. 2012). Finally, we note that, "[b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination [whether] the verdict is against the weight of the evidence." ***Id.***

In denying Wallace's motion for a new trial on the grounds that the verdicts were against the weight of the evidence,[9] the trial court reasoned as follows:

Although [] C.S. and [Dutton] both denied identifying [Wallace] at trial, they each previously identified him as being involved in the shooting. On April 16, 2018, C.S. gave a statement to Detective Crawford of the Norristown Police Department, where he picked [] Clary out of a photographic line-up. On September

---

[9] Wallace preserved this challenge by raising it in a post-sentence motion, as required by Pa.R.Crim.P. 607.

- 20 -

17, 2018, C.S. pled guilty to the charges against him in juvenile court, specifically admitting that he, [Wallace], and Clary were at the shooting together and acted in concert to assault the victim. At this trial, C.S. testified that he knows [] Wallace [and] identified him on the video surveillance from [] Pub Deli. C.S. admitted to being at the location where the shooting occurred at the intersection of Willow and Spruce Streets when the four shots were fired. When asked at trial if [Wallace] pulled out a gun and pointed it at the victim, he replied, "I don't recall. I was under the influence." However, C.S. identified himself in the video surveillance as one of the three people in a group together, with one member of the group pointing the gun. Although at trial C.S. declined to identify [Wallace] as being part of that group, he read the portion of the transcript from his September 17, 2018 guilty plea hearing admitting that he, [Wallace], and Clary were at the shooting together and acted in concert to assault the victim. That guilty plea constitutes direct and substantive evidence about his involvement with [Wallace].

Although [Dutton] also declined to identify [Wallace] while testifying at [] trial, he gave a statement on May 2, 2018[,] to Detective Crawford [] related to the shooting incident. In that statement[, Dutton] admitted that in his prior statements to police related to th[e] incident[, given on April 7, 2018 and April 9, 2018], he did not give police all of the information that he knew about [] because of "fear of someone retaliating against me and I wanted to make sure I was 100 percent sure." In conjunction with his statement to police on May 2, 2018, [Dutton] identified [Wallace] in a photographic array as an individual involved in th[e] shooting. When asked by police why he [] did not pick anyone out of the lineups that police previously showed him, he [again] stated [that he feared retaliation and wanted to be 100 percent sure of the shooter's identity]. When [Dutton] identified [Wallace] in the photographic array as a person involved in the shooting, he was asked how sure he was that he had correctly identified [Wallace], and his answer was, "100 percent."

When he testified, Detective Crawford identified [Wallace] together with Clary in the Pub Deli video.[10] Detective Crawford identified [Wallace] in the surveillance video as he retrieved a gun

_____

[10] Significantly, the parties stipulated that the individuals captured in the Pub Deli video clips were Wallace and Clary. *See* N.T. Jury Trial, 3/5/19, at 190-92.

- 21 -

from his vehicle, and as he went back inside [] Pub Deli carrying his firearm. Detective Crawford also identified [Wallace] in video surveillance after the shooting.

The identification of [Wallace] as the shooter is based on the evidence and does not shock the conscience. It is for the jury to determine the credibility of witnesses at trial. A jury['s] decision to credit certain evidence and reject other testimony is appropriate. The jury is allowed to reject the trial testimony of C.S. and [Dutton] as lacking credibility, and the jury can infer reasons why those two witnesses might decline to provide a positive identification of [Wallace] at trial. [Wallace]'s guilty verdict on each charge does not shock the conscience.

Trial Court Opinion, 10/21/19, at 11-13.

We agree with the trial court that the jury identified Wallace as the shooter based on all of the evidence, including: video footage before the shooting, of the shooting itself, and after the shooting, captured from several different angles; the testimony of all witnesses; C.S.'s statement to police and his admission in juvenile court implicating Wallace in the assault; and Dutton's pretrial identification of Wallace as the shooter. We find no abuse of discretion in the trial court's determination that Wallace's guilty verdict on each charge does not shock the conscience. **Cousar**, **supra**. Regardless of some witnesses' equivocation at trial regarding the shooter's identity, it was the jury's prerogative to decide whether to credit the statements C.S. and Dutton made before trial implicating Wallace in the shooting, or any of their trial testimony (including the fact that Dutton feared retaliation for identifying Wallace as the shooter). **See Commonwealth v. Palo**, 24 A.3d 1050, 1055 (Pa. Super. 2011) ("The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess

the credibility of the witnesses."); *see also Commonwealth v. Brown*, 648 A.2d 1177, 1190 (Pa. 1994) (appellate court, whose review rests solely upon cold record, stands on different plane than trial court, which is aided by on-the-scene evaluation of evidence; thus, appellate court not empowered to substitute its opinion regarding weight of evidence for that of trial judge).

Given the foregoing, Wallace's argument that "the Commonwealth's entire case relied on two extremely questionable witnesses[, C.S. and Dutton]," is unavailing. *See* Brief of Appellant, at 16. C.S.'s, Dutton's, and Detective Crawford's testimony corroborated what was captured on video surveillance and repeatedly shown to the jury without objection. There is nothing in the record to suggest that the trial court's decision to deny Wallace's motion for a new trial based on the weight of the evidence was a palpable abuse of discretion. *See Cousar*, *supra*; *see also Thompson*, *supra*. Accordingly, this claim fails.

Lastly, Wallace raises two arguments regarding his allegedly excessive sentence. Specifically, Wallace argues that the trial court committed an error of law or abuse of discretion "when it failed to properly consider the mitigation evidence and 'double-counted' [his] prior record score" upon fashioning his sentence. Brief of Appellant, at 10. No relief is due.

Wallace's claims raise a challenge to the discretionary aspects of his sentence. An appeal raising the discretionary aspects of sentencing is not guaranteed of right; rather it is considered a petition for permission to appeal. *Commonwealth v. Williams*, 562 A.2d 1385, 1368-87 (Pa. Super. 1989)

(en banc).  Before this Court can address such a discretionary challenge, an appellant must invoke this Court's jurisdiction by:  (1) filing a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) properly preserving the issue at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) including in his brief a concise statement of reasons relied upon for allowance of appeal pursuant to Pa.R.A.P. 2119(f); and (4) raising a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.  *Id.*

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis.  A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either:  (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

*Commonwealth v. Griffin*, 65 A.3d 932, 935-36 (Pa. Super. 2013) (citations and quotations omitted).

Here, Wallace filed a post-sentence motion for reconsideration of sentence, followed by a timely notice of appeal to this Court.  He has also included in his brief a concise statement of reasons relied upon for allowance of appeal with respect to the discretionary aspects of his sentence pursuant to Rule 2119(f).  Additionally, he raises two substantial questions by (1) pairing his excessiveness claim with an assertion that the court failed to consider mitigating evidence, *see Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014); and (2) asserting that the trial court "double-counted" his prior convictions in fashioning his sentence, where the sentencing

- 24 -

guidelines already require consideration of his criminal history. *See Commonwealth v. Watson*, 228 A.3d 928, 936 (Pa. Super. 2020). Therefore, we proceed to address the merits of Wallace's claims. We begin by noting our standard of review in sentencing matters:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias[,] or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014).

Deference is accorded to the trial court's pronouncement of sentence because the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. *Commonwealth v. Ward*, 568 A.2d 1242, 1243 (Pa. 1990). "When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S.A. § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant[.]" *Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006).

Because the sentencing guidelines are "merely one factor among many that the court must consider in imposing sentence," the court may deviate from the recommend guidelines "if necessary [] to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the

defendant, and the gravity of the particular offense as it relates to the impact on life of the victim and the community." *Id.*; *see also Commonwealth v. Eby*, 784 A.2d 204, 206 (Pa. Super. 2011). To do so, the sentencing court must demonstrate, on the record, its awareness of the sentencing guidelines and offer a contemporaneous written statement of the reason for deviating from the guidelines. *Commonwealth v. Yuhasz*, 923 A.2d 1111, 1118 (Pa. 2007); 42 Pa.C.S.A. § 9721(b). When reviewing a sentence outside of the guidelines, the essential question is whether the sentence imposed is reasonable, considering the nature and circumstances of the offense, the history and characteristics of the defendant, the opportunity of the sentencing court to observe the defendant, including any presentence investigation, the findings upon which the sentence was based, and the sentencing guidelines. *Commonwealth v. Walls*, 926 A.2d 957, 965 (Pa. 2007).

Furthermore, "[a] trial court judge has wide discretion in sentencing and can, on the appropriate record and for the appropriate reasons, consider any legal factor in imposing a sentence in the aggravated range." *Commonwealth v. Stewart*, 867 A.2d 589, 593 (Pa. Super. 2005) (citation omitted). Finally, where the court is in possession of a presentence report (PSI), we "presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Watson*, 228 A.3d 928, 936 (Pa. Super. 2020), quoting *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988).

Here, the record belies Wallace's assertion that the trial court failed to consider mitigating evidence. Before imposing sentence, the trial judge specifically stated on the record that she considered, *inter alia*: (1) "the principle that a sentence should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the victim, and on the community, and [Wallace's] rehabiliatit[ive] needs;" (2) all trial testimony and the surveillance footage of the shooting; (3) **Wallace's PSI**; (4) "all of the information about [Wallace's] background, [including] his childhood, his life[, and his family];" (5) Wallace's criminal history and lack of rehabilitation from prior periods of incarceration; and (6) the danger of additional violence against the community should Wallace be released. ***See*** N.T. Sentencing, 5/23/19, at 26-30 (emphasis added).

The trial court stated on the record its awareness that Wallace's sentence exceeds the sentencing guidelines, and further articulated its reasons for deviating from those guidelines as follows:

1. [Wallace] shot a stranger in the head and left him on the street. The victim had no connection to [Wallace] and his co-conspirators. The victim did not provoke the attack in any way. The crime reflects a cold-blooded attempt by [Wallace] to maliciously commit murder for sport.

2. [Wallace]'s lengthy criminal history and prior significant periods of state incarceration have been ineffective to accomplish rehabilitation, [and] have [not] deterred future criminal conduct. This crime occurred a mere eight months after [Wallace]'s release from serving a parole violation for prior firearms and drug[-]dealing offenses.

3. [Wallace] poses a clear danger to the community and this sentence is necessary to protect the community from his violent propensities.

4. The [c]ourt has a responsibility to impose confinement that is necessary to protect the public from acts of violence and terror. Based on [Wallace's] prior criminal history and the callous, dangerous[,] and menacing actions surrounding this crime, there is an undue risk that [Wallace] would commit another violent crime and harm another innocent person unless he is separated from the community.

5. Any lesser sentence would depreciate the seriousness of this crime.

Sentencing Order, 5/23/19.

In light of the foregoing, including the fact that the trial court considered Wallace's PSI before imposing his sentence, Wallace's claim that the trial court failed to consider mitigating evidence entitles him to no relief. **Devers**, **supra**; **Commonwealth v. Rhoades**, 8 A.3d 912, 919 (Pa. Super. 2010) (where court had benefit of PSI, it may be assumed sentencing court was aware of all relevant information, including mitigating factors).

Similarly, Wallace's argument that his sentence is unlawful because the sentencing court "double counted" his prior record score by "focus[ing] almost exclusively [] on his criminal history," fails. **See** Brief of Appellant, at 15.

This Court has stated that it is impermissible for a trial court "to consider factors already included within the sentencing guidelines **as the sole reason** for increasing or decreasing a sentence to the aggravated or mitigated range." **Commonwealth v. Simpson**, 829 A.2d 334, 339 (Pa. Super. 2003) (emphasis added). However, "trial courts are permitted to use prior conviction history and other factors included in the guidelines if they are used to

- 28 -

supplement other extraneous sentencing information." **See id.** (upholding sentence where trial court considered prior record score, impact on victim, threat to community, and defendant's lack of successful rehabilitation where offense was committed while on probation).

Here, as explained above, the trial court fashioned Wallace's sentence with the benefit of a PSI, and stated its awareness of the sentencing guidelines and its reasons for departing therefrom. These reasons included, in addition to Wallace's prior criminal history, the need to protect the community and the nature of the aggravated assault offense—i.e., the fact that Wallace's acts reflect a "cold-blooded attempt" to "murder for sport." N.T. Sentencing, 5/23/19, at 26-30; Sentencing Order, 5/23/19. Indeed, Wallace's argument that the trial court focused "almost exclusively," as opposed to "solely," on his prior criminal record inherently concedes that the trial court properly based its sentence on additional factors, such as the nature and seriousness of the offense and the need to protect the community from terror. **See** Brief of Appellant, at 15; **Simpson**, **supra**. Thus, we find that the trial court acted within its discretion in imposing Wallace's sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/21

- 29 -