J-S23039-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                                          :                    PENNSYLVANIA
                                                          :
                                 v.                       :
                                                          :
                                                          :
                                                          :
ARTHUR MCCORKLE                          :
                                                          :
                        Appellant              :   No. 67 EDA 2021

Appeal from the Judgment of Sentence Entered October 14, 2020
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0000595-2017

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED SEPTEMBER 15, 2021**

Appellant, Arthur McCorkle, appeals from the judgment of sentence of

21 to 42 years' incarceration imposed upon his resentencing.  After review,

we affirm.

The sentencing court relied on the following recitation of the underlying

facts in this matter, as set forth by the assistant district attorney at Appellant's

resentencing hearing:

> [O]n November 26th of 2016, at approximately 3:36 p.m.,
> Bucks County police radio received a call of a male covered in
> blood at the Grey Friars apartment complex in New Britain
> Township, Bucks County. On scene responding officers located
> Thomas Grimes, the victim, who had been stabbed, beaten and
> his throat slashed and blood pouring out of a gaping wound in his
> throat. Because of his throat being slashed, Grimes was unable to
> communicate with police officers. However, he was able to write

---

[*] Retired Senior Judge assigned to the Superior Court.

a few notes on the notepad before feeling like he was passing out due to the significance of his injuries.

Grimes indicated that approximately 30 minutes earlier, he was awakened by two black males later identified as Appellant and [co-defendant Daron] Davis standing at his bed and pointing guns in his face. Grimes noted that they were strangers to him. Responding officers noted that there were no signs of forced entry to the apartment. Investigation revealed that entry to the apartment was arranged and the robbery set up by co-defendant Keliyah Reaves. Reaves had been an acquaintance of Grimes' roommate and had been in the apartment and met Grimes several times prior because of her appointments with Grimes' roommate Rafiq James. Specifically, Reaves had a romantic relationship with James' nephew -- with whom she stayed at the apartment numerous times and has been met by James and Grimes.

While in the apartment, Reaves noticed that James had numerous very nice items such as shoes, watches and other items, and arranged with Appellant and Davis to take James' items from the apartment when he was not present on November 26th.

On November 26th[, the] investigation revealed that Reaves had entered the Blue Dog Tavern in New Britain Township on multiple occasions and asked to speak with James who was working there that day. When speaking with James, Reaves mentioned that she was supposed to meet James' nephew at the apartment, a made-up story told to facilitate James calling his roommate, Grimes, to allow Reaves to come into the apartment and allegedly wait for James' nephew. James did call Grimes and instructed Grimes to allow Reaves in to wait for Anthony Bizzell, his nephew. Grimes unlocked the front door to allow Reaves entry and went back to sleep in his room after working much of the previous night. Minutes later Grimes was awoken by Davis and Appellant standing above him each with firearms asking where James' items were and questions about a combination to a safe. Grimes continuously answered that he did not know, and Davis and Appellant continued getting more violent.

Reaves was located in the living room at this time. Grimes was pistol whipped by Appellant … causing multiple wounds to his head. He also had one of the -- he also had one of the pistols placed on his testicles as he was on all fours on the floor with both [Appellant and Davis] continuing to ask about the items in the safe. Grimes' arms and legs were bound by the actors. Grimes

- 2 -

was handed a picture of his infant daughter that had been on the wall and told that this was the last time he was going to see her if their demands were not met. The picture was held in front of his face and recovered from the room.

Despite attempting to comply with the actors, Grimes was beaten and cut multiple times on his body. After this time period Appellant left the room and ransacked James' room with the assistance of Reaves. Multiple bags of items were taken including dozens of shoes, watches, two X-Box consoles and cash.

While Appellant and Reaves were ransacking the apartment, Davis remained in the bedroom with Grimes. Grimes was asked two questions that made him believe that he was not going to make it out alive. First, whether his neighbors downstairs were home; and, secondly, whether he had a sack of potatoes to use as a firearm silencer. When Grimes responded that his neighbors were home and he had no potatoes, Davis pushed Grimes down onto the bed, held [him] with one hand, and sliced his throat with a box cutter. When Grimes tried to push back up, [Davis] sliced the back of his throat. Davis[, Appellant,] and Reaves rushed out of the house with all the items including Grimes' phone[,] leaving him for dead. Grimes played dead for a short period of time, staggered to his feet, wrapped a towel around his neck and with blood pouring out of his neck made it to a neighbor's front door[,] who called for help as Grimes was unable to speak.

At approximately 11:00 p.m. that evening[, Appellant, Davis, and Reaves] were stopped in Bensalem at a Neshaminy Valley Inn during another investigation. At that time Davis was in possession of a Smith & Wesson .38 caliber firearm and was arrested. Appellant and Reaves were let go that evening; however, [they were] picked up two days later in Philadelphia after being positively identified by Grimes during a photo lineup.

A search warrant was conducted at the home of Appellant in Philadelphia and multiple items from the New Britain incident were found inside the home. When Davis was arrested, he was wearing multiple items of James['s,] including a Gucci watch and Gucci sneakers.

During the course of the police investigation[,] police executed numerous search warrants and court orders on cell phones belonging to all three individuals. During review of those phone dumps[,] specific conversations between Reaves, who was inside the apartment at the time, and Appellant were retrieved

during which specific instructions were given about when it would be the right time to enter the apartment. Additionally[,] conversations about the set up of the robbery were retrieved, and it was discovered that it had been set up three days prior to the event between [Appellant, Davis, and Reaves].

Following the event[,] there were multiple discussions retrieved from Appellant's cellphone revealing discussions of selling numerous items that were stolen from the robbery.

Interviews with Reaves [indicated] that she … observed Davis leave Grimes' bedroom with a bloody box cutter and blood all over a book bag and camouflage pants he was wearing.

Reaves described Appellant['s] backing into a parking spot directly in front of the apartment and opening the trunk of the [vehicle] to put the items in. Additionally[,] Reaves described multiple conversations that occurred while the three [of them] were driving away from the scene between Davis and Appellant where they bragged about what they had done to Grimes[,] believing him to be dead and noted that, ["]I slit his throat, his stuff was hanging out of his neck.["] Additionally Davis said, ["that nigga would not die and I had to stab him in the back of his neck because he would keep on moving.["] Davis and Appellant were laughing when discussing Grimes' injuries[,] according to Reaves. It was Reaves' belief that both Appellant and Davis believed Grimes to be dead when they left the apartment. Grimes' phone was thrown out of the window of Appellant's [vehicle] as they were leaving Route 309. Reaves advised that all Appellant's clothing was discarded in Philadelphia.

Grimes was rushed to Abington Memorial Hospital where he underwent life[-]saving surgery to repair life[-]threatening wounds to his esophagus from his throat being cut multiple times with a box cutter. After waking up from surgery[,] doctors explained while his life was saved[,] it was 90 percent likely that his voice was going to be lost. Following ten days in the hospital[,] Grimes regained partial use of his voice; however, [he] remained with a feeding tube for several months following the incident.

N.T. Resentencing, 10/14/20, at 4–13 (name designations altered and unnecessary capitalization omitted); *see also* Sentencing Court Opinion, 4/5/21, at 2–5; N.T. Sentencing, 9/26/2017, at 5–14.

A prior panel of this Court set forth the procedural history of this matter as follows:

> [Based on the foregoing, o]n November 29, 2016, Appellant was charged with numerous offenses relating to the home invasion and assault. On June 20, 2017, he entered an open guilty plea to all charges set forth in the criminal information[: two counts of aggravated assault, robbery, burglary, theft by unlawful taking, possession of an instrument of crime, unlawful restraint, and false imprisonment, as well as counts of conspiracy to commit each of the above offenses.[1]] On September 26, 2017, prior to sentencing, the Commonwealth requested and was granted leave to *nolle pros* certain counts.[3] Appellant's plea to the remaining counts, as provided above, stayed unchanged. The matter then proceeded to sentencing.[4] The court imposed the following sentence: (1) a term of 106 to 212 months' [incarceration] for aggravated assault; (2) a consecutive term of 118 to 236 months' incarceration for robbery; and (3) a consecutive term of 76 to 152 months' [incarceration] for burglary[, which resulted in an aggregate term of 25 to 50 years' incarceration].[5] Appellant filed a post-sentence motion for reconsideration, which was denied by the court without a hearing on October 20, 2017.

---

[3] Specifically, the Commonwealth *nolle prossed* charges of attempted homicide, criminal trespass and attempt and conspiracy to the same, and attempt and conspiracy to receiving stolen property.

[4] Appellant was sentenced at the same time as Davis and Reaves.

---

[1] 18 Pa.C.S. §§ 2702(a)(1) and (a)(4), 3701, 3502(a)(1), 3921(a), 907(a), 2902(a)(1), 901(a), and 903, respectively.  Co-defendants Davis and Reaves also pleaded guilty to numerous charges.  Neither co-defendant is a party to this appeal.

5 The [sentencing] court ordered costs of prosecution and restitution, but did not impose a further penalty with the remaining convictions. Appellant was also given credit for time served.

***Commonwealth v. McCorkle***, No. 3790 EDA 2017, 200 A.3d 588 (Pa. Super. filed Oct. 19, 2018) (unpublished memorandum at 5–6). Thereafter, Appellant filed a timely notice of appeal to this Court, which affirmed his judgment of sentence on October 14, 2018. ***Id.*** (unpublished memorandum at 10). Appellant did not seek allowance of appeal from our Supreme Court.

On February 4, 2019, Appellant filed a timely *pro se* petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, seeking, *inter alia*, reinstatement of his right to file a petition for allowance of appeal (PAA) *nunc pro tunc* with our Supreme Court. The PCRA court appointed counsel and upon agreement of the parties, the PCRA court granted the petition on April 12, 2019, insofar as Appellant was permitted to file a PAA *nunc pro tunc*. However, Appellant did not file a PAA *nunc pro tunc* and thus, his judgment of sentence became final on May 13, 2019.[2]

Thereafter, counsel filed a timely PCRA petition on May 5, 2020, claiming that the sentencing guidelines used at Appellant's September 26, 2017 sentencing hearing contained an incorrect prior record score (PRS) for Appellant. The Commonwealth agreed and after a hearing, the PCRA court

_____

2 The 30th day was Sunday, May 12, 2019. Therefore, Appellant had until Monday, May 13, 2019, to file a timely PAA. 1 Pa.C.S. § 1908.

granted said petition on August 25, 2020. Accordingly, the PCRA court ordered a new sentencing hearing based on recalculated sentencing guidelines, which was held on October 14, 2020.

At the resentencing hearing, the court vacated Appellant's judgment of sentence and resentenced Appellant to an aggregate term of 21 to 42 years' incarceration.[3] Appellant filed a motion for reconsideration of his sentence *nunc pro tunc*[4] on October 30, 2020, which the sentencing court denied. Appellant then filed a timely appeal of the judgment of sentence.[5]

In his sole issue on appeal, which he subdivides into numerous parts, Appellant challenges the discretionary aspects of his sentence:

Did the [sentencing] court err in denying Appellant's request for reconsideration of sentence, and the court abused its discretion at sentencing, in that the court failed to consider:

A. Running the charges/sentences consecutively solely focuses on the crime and not the fact that Appellant's record is not extensive;

B. At the time of the crime Appellant was young, made a mistake, and was an adolescent at the time of the incident;

_____

[3] Specifically, the sentencing court resentenced Appellant as follows: 90 to 180 months' incarceration for aggravated assault; 102 to 204 months' incarceration for robbery; 60 to 120 months' incarceration for burglary. Sentencing Order, 10/14/20. All sentences were set to run consecutively. *Id.*

[4] The court granted Appellant's motion to file his post-sentence motion *nunc pro tunc*.

[5] Appellant filed his statement of errors complained of on appeal on January 11, 2021, and the sentencing court entered its opinion on April 5, 2020.

C. At the time of the crime Appellant was 19 years old and his brain was not fully developed as an adult, even though he was over 18 years of age;

D. The sentence rendered by the court will result in Appellant serving more time in prison than the number of years he was alive at the time of the crime;

E. Appellant's female co-defendant received a sentence of 11 ½ to 23 years even though she set everything up;

F. The sentence imposed is excessive given that Appellant was not convicted of criminal attempt-murder;

G. Appellant pled guilty and did not go to trial;

H. Appellant believes that a sentence identical to his female co-defendant, or slightly longer, is appropriate under the circumstances;

I. Appellant believes a sentence of more than twenty (20) years based on a mistake, is excessive;

J. Appellant has three young children who are in the custody of his mother, who has numerous health problems; and,

K. The sentence is excessive because Appellant will not be paroled until after he is forty (40) years old and at that point in time he will not be able to start a meaningful life or be a productive member of society.

Appellant's Brief at vi (unnecessary capitalization omitted).

Our standard of review for a challenge to the discretionary aspects of sentencing is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Lekka*, 210 A.3d 343, 350 (Pa. Super. 2019) (citation omitted). "A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." *Commonwealth v. Hoch*, 936 A.2d 515, 518 (Pa. Super. 2007) (citations and quotation marks omitted). Where an appellant challenges the discretionary aspect of a sentence, we must engage in a four-part analysis to determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence pursuant to Rule of Appellant Procedure 2119(f), Pa.R.A.P. 2119(f); and (4) whether the concise statement raises a substantial question that the sentence is not appropriate under the Sentencing Code.

*Lekka*, 210 A.3d at 349 (citation and brackets omitted).

Appellant filed a timely notice of appeal, preserved his appellate issue in a post-sentence motion, and included in his brief the concise statement required by Rule 2119(f). Appellant's Brief at 8–11. Therefore, we will

address the issue of whether Appellant has raised a substantial question that his sentence is not appropriate under the Sentencing Code.

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

*Lekka*, 210 A.3d at 349 (citation and quotation marks omitted).

In his Rule 2119(f) statement, Appellant argues that the sentencing court abused its discretion by imposing "consecutive sentences on all counts, at the top of the standard range." Appellant's Brief at 9. Appellant contends that this presents a substantial question because "the imposition of consecutive sentences in this instance, *i.e.*, based on the criminal conduct at issue, results in a manifestly excessive sentence." *Id.* Such a claim fails to raise a substantial question for our review. *Commonwealth v. Radecki*, 180 A.3d 441, 468 (Pa. Super. 2018) ("We consistently have recognized that excessiveness claims premised on imposition of consecutive sentences do not raise a substantial question for our review.") (citations omitted).

Appellant also claims that his sentence is excessive because the court failed to explain how its assessment of the statutory factors, and specifically the mitigating factors enumerated in Appellant's statement of questions involved, provided reason to sentence Appellant to an aggregate term of 21 to 42 years' incarceration. Appellant's Brief at 10. In other words, Appellant

argues that the court's sentence and lack of a statement on the record explaining the reasons for the sentence imposed indicates that the sentencing court failed to consider adequately those enumerated mitigating factors. ***Id.*** Such a claim likewise does not raise a substantial question for our review. ***Radecki***, 180 A.3d at 469 ("This court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review.") (quoting ***Commonwealth v. Eline***, 940 A.2d 421, 435 (Pa. Super. 2007)); ***Radecki***, 180 A.3d at 469 (concluding that Radecki "failed to raise a substantial question with respect to his excessiveness claim premised on the imposition of consecutive sentences and inadequate consideration of mitigating factors.").

Nonetheless, while neither of the reasons Appellant relies upon for allowance of appeal with respect to the discretionary aspects of his sentence presents a substantial question on its own, this Court has held that an excessive sentence claim "pair[ed] … with an assertion that the court failed to consider mitigating evidence" constitutes a substantial question. ***Commonwealth v. Wallace***, 244 A.3d 1261, 1278 (Pa. Super. 2021); ***see also Commonwealth v. Akhmedov***, 216 A.3d 307, 328 (Pa. Super. 2019) (*en banc*); ***Commonwealth v. White***, 193 A.3d 977, 983 (Pa. Super. 2018) (citations and some quotation marks omitted) ("[P]rior decisions from this Court involving whether a substantial question has been raised by claims that the sentencing court 'failed to consider' or 'failed to adequately consider' sentencing factors [have] been less than a model of clarity and consistency.").

Therefore, insofar as Appellant is arguing, in conjunction with his claim of an excessive sentence, that the court failed to consider altogether the enumerated mitigating factors, we will review the merits of Appellant's claim.

Appellant asserts that the trial court failed to give adequate weight to mitigating factors of his youth, his remorse and guilty plea, his three young children, and his age of 40 at the time he would be eligible for parole. Appellant's Brief at 13–15. While conceding their heinous nature, he characterizes his crimes as mistakes and chalks them up to adolescence and immaturity. *Id.* at 13–14. He believes that as he serves time in prison, he will mature, change, grow, learn, and "gain insight as to the effect his crimes have on the victim and society." *Id.* at 14. According to Appellant, because he will spend more years in prison than the number of years he was alive at the time of sentencing, the sentencing court abused its discretion. *Id.* He also focuses on co-defendant Reaves's lesser sentence and contends the court abused its discretion in imposing different sentences "for participation in the same crime." *Id.*

Upon review, we conclude the sentencing court did not abuse its discretion at resentencing. The record reflects that the court (1) was aware of the facts of the case; (2) heard testimony from Appellant, who spoke about his upbringing and removal from his mother's care by social services, education, juvenile record, mental health and drug history, and behavior in prison; (3) heard Appellant's allocution, where he took responsibility for his crimes, apologized to the victims, their families, his family, the court, and the

community, and explained how he was more mature at age 24 than he was at age 19 when he was sentenced, had gained insight into his past and "extremely poor" choices, had changed his "core beliefs" to pave the way to become a better and productive member of society, has three children whose mothers had either passed away or abandoned them, regrets the "huge mistake" he made, and prays for forgiveness; and (4) incorporated the notes of testimony from Appellant's prior sentencing hearing into the resentencing record, at which the same court had heard testimony from Appellant and his mother, father, stepfather, and brother; and (5)  considered the relevant factors set forth in subsection 9721(b) of the Sentencing Code, 42 Pa.C.S. § 9721(b).  N.T. Resentencing, 10/14/20, at 4–28; N.T. Sentencing 9/26/17.

At resentencing, the court acknowledged that Appellant showed "some maturity" and an appreciation of the seriousness of his crimes that he had not previously shown.  N.T. Resentencing, 10/14/20, at 32–33.  The court recalled the testimony of his family and their support at the prior hearing. *Id.* at 33. Nonetheless, the court noted that "this was one of the most violent incidents [it had] ever seen, been involved in in any way, as an attorney, as a judge. The depth of the violence, of the hatred, of the injuries, of the torture that was imposed was remarkable" and that the court would "always remember this case." *Id.* at 33–34.  The court stated:

> I take into account all of those factors that I've previously taken into account.  I take into account the fact that [Appellant] has shown some maturity, has shown some growth, indicates now a plan to continue to grow and to eventually get out of jail and have a life outside of prison.

- 13 -

I still believe that any lesser sentence would depreciate the seriousness of this crime. I believe that there's -- that [Appellant] is still in need of correctional treatment that can be provided most effectively by his commitment to a State Correctional Institution.

N.T., 10/14/20, at 34.

Furthermore, in its opinion, the sentencing court referenced what it had stated during Appellant's prior discretionary-aspects-of-sentencing appeal, again noting the gruesome facts of the case, the serious impact Appellant's conduct had on the community, and Appellant's overall role in the incident. The court also noted that Appellant had written to the district attorney's office while awaiting trial, wherein he impersonated co-defendant Davis and falsely stated that Davis accepted full responsibility for the incident and denied that Appellant gave Davis a sign to slit Grimes's throat. Sentencing Court Opinion, 4/5/21, at 9–10. Finally, the court resentenced Appellant in the standard range, compared to its prior imposition of aggravated range sentences.[6] Thus, we discern no abuse of discretion by the sentencing court.

For the foregoing reasons, we affirm.

Judgment of Sentence affirmed.

---

[6] We also point out that while this Court found Appellant's discretionary-aspects-of-sentencing issue waived in his prior appeal, we also stated that if Appellant had preserved such issue, we would have concluded that his aggregate sentence of 25 to 50 years' incarceration was not excessive and the sentencing court provided sufficient reasoning for the sentence imposed. *McCorkle*, 3790 EDA 2017, 200 A.3d 588 (unpublished memorandum at 10 n.8).

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/15/2021*