J-S11028-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KAREEF ANTONIO GEOR EASINGTON | : | |
| | : | |
| Appellant | : | No. 4 WDA 2025 |
| | : | |

Appeal from the Judgment of Sentence Entered July 11, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0002337-2023

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.:          **FILED:  June 15, 2026**

Appellant, Kareef Antonio Geor Easington, appeals from the aggregate judgment of sentence of two consecutive terms of life imprisonment, without the possibility of parole, followed by a consecutive term of 1 to 2 years' incarceration, imposed after a jury convicted him of two counts of first-degree murder, 18 Pa.C.S. § 2502(a), and one count of tampering with evidence, 18 Pa.C.S. § 4910(1).  After careful review, we affirm.

At trial, the following testimony was presented.  John Muncie of the Swissvale Fire Department testified that on February 15, 2023, he and his partner were dispatched to Apartment 10 of a residential apartment building for a report of a 47-year-old male with chest pain.  N.T. Trial, 4/9/24, at 75-

76.[1]  Medic Muncie testified when they received no response to knocks on Apartment 10's door, they were let in by the building manager and discovered no one was present.  *Id.* at 77.  Medic Muncie testified he then provided the building manager with the phone number on the dispatch record, and she confirmed it was associated with Apartment 9.  *Id.* at 77-78.  At Apartment 9, Medic Muncie testified they attempted to make entrance with a key provided by the building manager; however, they discovered the door was chained shut and barricaded with a chair laden with weights.  *Id.* at 78.  Medic Muncie testified police assistance was then requested.  *Id.* at 79.

Sergeant William Hahn of the Swissvale Police Department testified he received the request to assist Medic Muncie.  *Id.* at 55.[2]  Sergeant Hahn testified that after being briefed on the situation, he proceeded to Apartment 9 and was informed the mother of the resident had requested police make forcible entry into the apartment if necessary.  *Id.* at 55-56.  After announcing his presence and intent to force entry and receiving no response, Sergeant Hahn broke the chain lock and obtained entry into Apartment 9.  *Id.* at 57. Sergeant Hahn testified that upon entering the apartment, there is a living room with the kitchen off to the right and the rest of the apartment continues

---

[1] We note that although the trial transcript is dated April 9, 2024, Appellant's jury trial lasted from April 9-16, 2024.

[2] Sergeant Hahn had previously been dispatched to Apartment 6 earlier that morning, at which time contact was made with the male resident who stated he had not called 911 and was not in need of assistance.  *Id.* at 52-55.

out further from there. *Id.* at 57-58. Sergeant Hahn testified that as he was in the hallway clearing the apartment, his foot brushed against something and when he looked down, he observed a long comforter in front of him. *Id.* at 58. Upon lifting the comforter, Sergeant Hahn saw a large pool of blood on the underside of the comforter and an adult female on the ground with a gunshot wound to her head. *Id.* at 58-59. Sergeant Hahn testified when leaving the apartment, he observed firearms and gun magazines in the common areas, as well as a car key, SIM card, and spent gun casing in the bathroom. *Id.* at 60.[3] These were all later collected as evidence. *See id.* at 240, 242, 244-45, 247-49, 253-54, 256-61.

Sergeant Hahn testified he later reentered the apartment because they were aware of a child living there who they had yet to locate. *Id.* at 60-61. Entering a room which appeared to belong to a young girl, Sergeant Hahn testified he noticed a comforter on the bed and when he pulled it back, he found the second victim with her face toward the wall and a gunshot wound to the head. *Id.* at 61. Sergeant Hahn also observed the apartment's balcony door was open and when he stepped outside and looked down, he noticed what appeared to be possible foot imprints from someone jumping from the balcony. *Id.* at 65-67. On cross-examination, Sergeant Hahn was asked whether he touched the upper portion of the chair blocking the door as he

_____

[3] Later testimony revealed the car key, SIM card, and gun casing were discovered in the toilet. *See id.* at 244-45.

made entry, and when he stated he was unsure, body camera video was shown to the jury which depicted that occurring. *Id.* at 70-71.

Stipulations were entered identifying the adult deceased victim as M.C., and the child victim as her daughter, L.C., and indicating they "were pronounced deceased in Apartment 9 … at 10:56 a.m. on 2/15/2023 by Swissvale Firefighter John Muncie." *Id.* at 80, 108. Allegheny County Medical Examiner, Dr. Ariel Goldschmidt, testified the cause of both deaths was multiple gunshot wounds, and the manner of both deaths was homicide. *Id.* at 353-68.

Latara Stewart testified she was the maintenance office assistant for the building and she lived in Apartment 11, which was next door to Apartment 9. *Id.* at 91, 95. Ms. Stewart testified her neighbor, M.C., lived with her daughter and that for the past six months, Ms. Stewart had also seen a man, who she identified as Appellant, with keys frequently going in and out of the apartment. *Id.* at 95, 100. On cross-examination, Ms. Stewart was asked about whether she had previously been asked to identify M.C.'s boyfriend and Ms. Stewart confirmed she had not. *Id.* at 101-02. Ms. Stewart was also asked on cross-examination about her February 15, 2023 identification of M.C.'s boyfriend's vehicle, which she had described as "bronzey" in color. *Id.* at 102-03.

Four residents of the victims' apartment building were called as witnesses. Three of these witnesses testified that on February 15, 2023, between the hours of 6:30 a.m. to 7:30 a.m. they heard a child's scream and two loud noises described as "bangs", "pops", or "smacks[,]" but they did not

call police for various reasons. *Id.* at 104-07, 202-04, 208. The fourth witness testified he was the male resident who was contacted by Sergeant Hahn, and when asked whether he had seen M.C. with any adult males, he replied, "Not too much. Maybe one, maybe two…." *Id.* at 214-17.

The next witness called by the Commonwealth was J.C., the mother of M.C. and grandmother of L.C. *Id.* at 114. J.C. testified that M.C. lived with L.C. and had a boarder, whom she identified as Appellant by name and in person in court. *Id.* at 115-16. J.C. testified Appellant had been to her home twice and she had heard him speak. *Id.* at 117. When asked about being contacted by first responders on February 15, 2023, J.C. testified she was asked the whereabouts of her daughter and granddaughter. *Id.* She told first responders M.C. was on her way to work and L.C. was at school, because L.C. goes to school before 8:00 a.m. and M.C. typically drops L.C. off before heading to work. *Id.* at 117-18. *See also id.* at 197-201 (Jennifer Robinson's testifying as M.C.'s supervisor that M.C. was supposed to be at work between 8:00 a.m. and 8:30 a.m., but that she did not appear or respond to attempts to contact her). J.C. testified that after speaking with first responders, she called her son S.C. to go over to M.C.'s apartment and when she spoke with him next, he informed her M.C. and L.C. were dead. *Id.* at 118-19.

J.C. then testified regarding two phone calls with M.C. J.C. testified she called M.C. at 11:00 p.m. on February 14, 2023, because she was having a reaction to a medication and M.C. is a nurse. *Id.* at 119. J.C. testified M.C. agreed to come over with L.C. to see if a trip to the hospital was necessary,

but they never arrived. *Id.* at 119-20. J.C. testified that around 6:22 a.m. on the morning of February 15, 2023, she received a call from M.C. on speakerphone which was M.C.'s usual practice. *Id.* at 120-21. J.C. testified that although M.C. usually had an upbeat voice when she called in the morning and would say, "Get up, get up, Mom. It's time to get up[,]" on that morning M.C. said, "Mom? Mom, are you all right?" *Id.* at 120. J.C. and the Commonwealth then had the following exchange:

> [The Commonwealth:] Did you ask [M.C.] why she didn't make it to your house the night before?
>
> [J.C.:] I didn't have time to. She said to me, "Mom, we were trying to get to your house. We left from Swissvale, [L.C.] and I, and he jumped out and said he will drive." She said when we got close to — when they got close to my house, he start[ed] driving around and he went down to Washington Boulevard. And what she was saying to me — she said ["]he dragged me out of the car arrested [*sic*] strangling me and dragged me in the bushes and was strangling me. And [L.C.] was screaming so loud. I['ve] never heard [L.C.] cry that loud before.["]
>
> ***
> [The Commonwealth:] Okay. Okay. Now, after [M.C.] tells you about that incident on Washington Boulevard, does [M.C.] reference anything about her keys?
>
> [J.C.:] Yes.
>
> [The Commonwealth:] And what did [M.C.] say?
>
> [J.C.:] [M.C.] — first of all, she said, ["M]om, I never slept a wink last night.["] She said, ["H]e took my keys and he wouldn't give them to me.["] So I yelled because I was on speakerphone and she was on speakerphone to me[,] I yelled and said, "Give her her keys. She has to go to work."
>
> [The Commonwealth:] Now, do you know if [M.C.] ever got her keys back?

[J.C.:] Yes. I said, ["M.C.] did you get the keys?["] She said ["Y]es, Mom, he gave them — he took them out of his pocket and gave them to me.["] I am just telling you exactly what she said to me. She said, ["H]e took them out of his pocket and gave them to me even though he was telling me he didn't know where they were.["]

*Id.* at 120-22. J.C. testified that, during the call, she heard Appellant's voice in the background saying, "[W]ho is that?" in an aggressive tone of voice. *Id.* at 122-23. The Commonwealth finished questioning J.C. regarding the phone call as follows:

[The Commonwealth:] Okay. Now, before the phone call ended, did you … hear [M.C.] say anything?

[J.C.:] Yes. … the last words of my daughter [were] "[g]et the effing hell out of my house."

\*\*\*

[The Commonwealth:] Now, [J.C.], did she say effing? Or did she actually say the words? And I know it might not be in your nature.

[J.C.:] She said the word.

\*\*\*

[The Commonwealth:] … And, [J.C.], when you heard [M.C.] say that, "Get out of my apartment[,"] how would you describe her tone of voice at that time?

[J.C.:] She was angry. …

[The Commonwealth:] Now, [J.C.], after that phone call with [M.C.], did you ever talk to [M.C. again]?

[J.C.:] No. The next time I heard[,] my children were dead.

*Id.* at 124-25.

Finally, J.C. testified regarding her interview with detectives at S.C.'s house. J.C. testified detectives asked if she could recognize the voice on a

911 call, and she identified the caller as Appellant. *Id.* at 125-26.[4] The Commonwealth then played three 911 calls for J.C., and she testified after each that she recognized the voice of the caller as Appellant. *Id.* at 127-31. On cross-examination, J.C. was asked whether she had ever spoken to Appellant over the phone before and she confirmed she had not. *Id.* at 132-33.

The Commonwealth then called S.C. to testify. S.C. confirmed his relationship with M.C. (his sister) and L.C. (his niece) and testified Appellant lived with them for over a year. *Id.* at 142-43. S.C. also testified Appellant was storing some of his belongings in S.C.'s garage, and S.C. had talked with Appellant and heard his voice before. *Id.* at 143. S.C. testified he missed a call from M.C. at 1:13 a.m. on February 15, 2023, and when he tried to call her back at 1:42 a.m. and 1:43 a.m., she didn't answer. *Id.* at 145-46, 151-52. S.C. testified he had talked to M.C. a few hours later, at 6:54 a.m., about his picking L.C. up from school. *Id.* at 147, 152. S.C. testified that an outgoing call to M.C. at 9:25 a.m. was not answered. *Id.* at 152. The Commonwealth then introduced a screenshot of S.C.'s phone call log that he had provided to police. *Id.* at 149-50. S.C. testified regarding his sister's

_____

[4] Stipulations were entered that three 911 calls were made on February 15, 2023, at 9:06 a.m., 9:32 a.m., and 9:34 a.m., from what was later identified as M.C.'s phone number and the audio admitted accurately reflected those calls. *Id.* at 109-11.

phone number[5] and that he provided detectives with other phone numbers, including a phone number for Appellant of 973-910-7566. ***Id.*** at 151, 157, 163. S.C. testified he had been interviewed by detectives on February 16, 2023, and at that time, a 911 call was played, and he identified Appellant as the caller. ***Id.*** at 153. The Commonwealth then played all three 911 calls in court and S.C. identified Appellant's voice on each. ***Id.*** at 153-57.

Detective Nicole Grimm of the Allegheny County Police testified regarding the voice identification she and Detective Ronald Bodnar had conducted with J.C. and S.C., including how the parties had been separated prior to any of the 911 clips being played. ***Id.*** at 167-72. On cross-examination, Detective Grimm was questioned about the importance of avoiding suggestiveness during identifications, and whether she had asked S.C.'s wife just prior to the 911 calls being played, "How often do you speak to [Appellant]?" ***Id.*** at 173-80. Detective Grimm testified she did not recall, so body camera video depicting that question being asked to S.C.'s wife was played for the jury. ***Id.*** at 180-86. ***See also id.*** at 553-55 (Detective Bodnar's testifying regarding the importance of avoiding suggestion and his response of "that's [Appellant]?" after J.C. stated "that's him" during the 911 identification).

Daniel Wolfe, a scientist with the forensic laboratory of the Allegheny County Medical Examiner's Office, provided extensive testimony regarding his

---

[5] Later in the trial, a stipulation was entered that the number provided by S.C. belonged to M.C. and was serviced by T-Mobile. ***See id.*** at 304.

work on February 15, 2023, as a member of the Mobile Crime Scene Unit responsible for photographing the scene, taking measurements and sketches, as well as documenting and collecting physical evidence. *See id.* at 221-87. Notably, Mr. Wolfe testified regarding disturbances in the mulch under Apartments 5 and 9, which appeared to be a possible trail from the first floor down to the street. *Id.* at 227-28.[6] In Apartment 9, Mr. Wolfe testified he photographed two dumbbells along with a kitchen table and chair which had been used to barricade the door. *Id.* at 238-39. Mr. Wolfe testified he swabbed the chair, dumbbells, and latch on the front door for touch DNA. *Id.* at 250-51, 261. Regarding the ballistics evidence found, Mr. Wolfe testified a Ruger handgun[7] was found under M.C.'s right hip which was also swabbed for touch DNA, and there were Glock magazines and an empty box for a Glock handgun in the larger bedroom. *Id.* at 243, 245, 248, 255, 261-67. Mr. Wolfe testified that a toothbrush was also found under M.C.'s body. *Id.* at 246. Additionally, Mr. Wolfe testified that a blanket located around L.C. contained burn marks and a bullet hole. *Id.* at 246, 276-77.

Detective Donald Oesterle of the Allegheny County Police testified that on February 15, 2023, he was tasked with processing the scene alongside Mr. Wolfe. *Id.* at 288. Detective Oesterle testified that in a large black bookbag

---

[6] Mr. Wolfe testified he processed the balcony of Apartment 5, but no evidence was recovered. *Id.* at 228.

[7] Detective William Hermann later testified the Ruger was fully loaded, as the magazine contained its max capacity of seven (7) rounds. *Id.* at 418.

near the sliding balcony door of Apartment 9, he found immigration forms, a driver's license, marriage license, checks, and child custody paperwork belonging to Appellant. *Id.* at 291-92. Additional signs of Appellant's residency in Apartment 9 included vehicle registration forms and a Jamaican passport. *Id.* at 292-93. Detective Oesterle testified the child custody paperwork was a three-page document sent to Appellant at the address of the victims' apartment, and page 2 of the document had the name Delrico Fletcher with a last known address of 1916 Monroe Street, Swissvale, PA. *Id.* at 295-96. *See also id.* at 344-52 (Detective Erik Schlarp's testifying contact was made with Delrico Fletcher, but he did not appear for an interview and claimed he did not know anyone associated with the case). Detective Oesterle testified a search warrant was obtained for the SIM card recovered from the toilet, which revealed it was registered to the telephone number for Appellant provided by S.C. *Id.* at 297. Detective Oesterle then testified the empty gun case was associated with a Glock 17, which was registered to Appellant. *Id.* at 300-01. *See also id.* at 417 (Detective Hermann's testifying regarding the recovered firearms and the associated registrations). Detective Oesterle testified a jacket found on the floor in L.C.'s bedroom was an extra-large Hilfiger winter coat for a male. *Id.* at 301.

Stipulations were entered that search warrants for the call detail records of M.C.'s phone number and 412-273-2757 ("2757")[8] were obtained. *Id.* at 304-05. The records were provided by the carrier T-Mobile to police, who then provided them to Special Agent John Orlando of the FBI. *Id*.

At that point, Special Agent Orlando was called to testify. Special Agent Orlando testified he works for the Cellular Analysis Survey Team, whose job is to find devices either in real time or historically to show "the general area a device was in [during] a particular time frame." *Id.* at 307-08. Special Agent Orlando testified to the cell phone records of M.C.'s and the 2757 phone numbers and their device locations from February 14, 2023, at 9:38 p.m. to February 16, 2023, at approximately 8:40 a.m. *Id.* at 323-34. Special Agent Orlando testified that between 9:38 p.m. and 10:20 p.m. on February 14, 2023, both phones were located in the general area of the victims' apartment building. *Id.* at 324-25. Special Agent Orlando testified from 10:28 p.m. to approximately 1:13 a.m., there was no activity on M.C.'s number, but the 2757 number was moving in a northerly direction through Wilkinsburg, Harwick, and Harrison Township before ending up near Plain Grove off Interstate 79. *Id.* at 325-26. Special Agent Orlando testified that at

---

[8] Detective Hermann later testified this is a phone number for Appellant he received from Appellant's sister, Georgia Easington. *Id.* at 406-08. Detective Hermann testified a review of the call records showed interactions with both Ms. Easington's and M.C.'s numbers. *Id.* at 408-10.

approximately 1:13 a.m., M.C.'s number made an outgoing call which showed the device was also in the Plain Grove area. *Id.* at 327.

Special Agent Orlando testified both phones remained in the same general area until around 3:21 a.m. when the 2757 number began heading south toward Zelienople. *Id.* at 328. Special Agent Orlando testified that from 3:55 a.m. to 4:40 a.m. on the morning of February 15, 2023, there was no activity for M.C.'s number while the 2757 number continued moving east and southeast around Greentree, North Braddock, and down into White Oak. *Id.* at 329. Special Agent Orlando testified around 5:06 a.m., the 2757 number returned to an area consistent with the victims' apartment building. *Id.* at 329-30. Special Agent Orlando testified from 5:07 a.m. to 10:00 a.m., both phones remained in the general area of the apartment, with M.C.'s number making an outgoing call at 6:22 a.m. and receiving an incoming call at 6:54 a.m. *Id.* at 330-31. Finally, Special Agent Orlando testified the 2757 number had activity on February 16, 2023, which overlapped with 7367 Denniston Avenue, an address discussed further *infra*, before ultimately the device connected around Kennedy Township and the City of Pittsburgh, where it remained through February 18, 2023. *Id.* at 331-34.

Detective Hermann testified he ran the license plate for Appellant's car through a plate reader, which registered Appellant's vehicle at the intersection of Route 19 and Route 528 in Butler County at 3:23 a.m. on February 15,

2023. *Id.* at 373-75.[9] Detective Hermann testified a review of video footage obtained from an apartment across the street from Apartment 9 appeared to show that on the morning of February 15, 2023, the balcony door of Apartment 9 was shut at 9:24 a.m., but a clip at 10:16 a.m. indicated the door was open. *Id.* at 380-84.[10]

Samuel Snyder testified that on February 15, 2023, she was living in an apartment at 7367 Denniston Avenue in Swissvale and was subsequently contacted by police about a guest who had been in her home. *Id.* at 386. Ms. Snyder testified she had video surveillance on the exterior of her apartment, and she provided police with the footage from February 15, 2023. *Id.* at 386-87. Ms. Snyder testified on that date, around 10:00 or 10:15 a.m., a man she identified in court as Appellant, came to her home wearing a sweater, pair of pants, and a bookbag. *Id.* at 387-90. Ms. Snyder testified that while Appellant was in her home, he shaved and she assisted him in drying out his phone, but she did not provide him with a SIM card despite being asked to. *Id.* at 388-89, 394. The Commonwealth admitted into evidence and played for the jury the video footage provided by Ms. Snyder from 7367 Denniston Avenue, Apartment 1 on February 15, 2023, at 10:50

_____

[9] We note the testimony of Detective Hermann does not specify which department he is employed by.

[10] This footage was stipulated to by the parties and entered as an exhibit. *Id.* at 339-42.

a.m., which showed Appellant arriving at Ms. Snyder's apartment. *Id.* at 390-91.

Detective Hermann was recalled to the stand at which point he testified regarding video footage from a residence northwest of where the victims' apartment building is located, captured on February 15, 2023, between the hours of 8:30 a.m. to 11:00 a.m., which had been entered into evidence by stipulation. *Id.* at 397-99, 400-01. Detective Hermann testified that a 15-second clip from that video at 10:12 a.m. on February 15, 2023, shows a person emerging from the victims' apartment building wearing a gray hooded long sleeve shirt, blue jeans, and carrying a backpack. *Id.* at 404.[11] Detective Hermann testified the distance between the victims' apartment building and 7367 Denniston Avenue is .7 miles. *Id.* at 420.

Detective Hermann then testified regarding the arrest of Appellant on February 18, 2023. The detective explained Appellant was picked up in downtown Pittsburgh wearing a grey Puma brand hooded sweatshirt, blue jeans, black shoes, and carrying a black JanSport backpack, clothing that matched the footage from Denniston Avenue discussed *supra*. *Id.* at 421, 426-27. Detective Hermann testified that after Appellant's arrest, search warrants were obtained for Appellant's personal effects including his clothing and backpack. *Id.* at 428-29. Detective Hermann testified Appellant's

---

[11] In its closing argument, the Commonwealth noted this video shows the individual "is running[,] but he's also limping because he had to jump off the balcony." *Id.* at 599.

backpack contained military and other personal documents, food wrappers, gloves, a sock, Appellant's American passport, Pennsylvania driver's license, social security card, and USAA bank card. *Id.* at 435.

Next, the Commonwealth called several experts from the forensic laboratory of the Allegheny County Medical Examiner's Office. Mr. Wolfe was recalled by the Commonwealth regarding the gunshot residue tests he performed. Mr. Wolfe testified that analyses of Appellant's clothing at the time of his arrest, as well as the Hilfiger jacket found on L.C.'s bedroom floor, were all positive for gunshot residue. *Id.* at 449-54. On cross-examination, Mr. Wolfe was questioned about how gunshot residue is transferred, and he conceded it may be deposited by simply being in the vicinity when a firearm is fired or by encountering a surface bearing gunshot residue. *Id.* at 455-60. Additionally, Erin Medvid, firearms and toolmarks examiner for the laboratory, testified she examined two firearms, four spent cartridge cases, and four projectiles. *Id.* at 475. Ms. Medvid testified that all the cartridge cases and bullets had been discharged from the same firearm, but none of them originated from the two Ruger firearms submitted. *Id.* at 476-80. Finally, Ms. Medvid testified the cartridge cases had a chisel shaped firing pin, which is primarily associated with Glock pistols. *Id.* at 485. Corey Lawton, who works in DNA analysis at the laboratory, testified he completed DNA analysis on swabs from the Ruger found under M.C., the chain lock, both dumbbells, the chair, a coat, a SIM card holder, M.C.'s fingernails, and Appellant's T-shirt, with comparison to DNA samples taken from M.C., L.C., and Appellant. *Id.* at

512-13. Mr. Lawton testified the data from swabs of the Ruger, dumbbells, chair, coat, and T-shirt was uninterpretable. *Id.* at 514.[12] Mr. Lawton testified the swabs from the chain lock and SIM card holder contained an insufficient quantity of DNA for processing. *Id.* at 515.

Finally, the Commonwealth called Jennifer Bracamontes, a DNA analyst for a company called Cybergenetics. *See id.* at 522-23. Ms. Bracamontes testified her company uses a product called TrueAllele to interpret electronic DNA data files, separate out different contributors, and compare profiles with known individuals to generate match statistics. *Id.* at 524-25. Ms. Bracamontes testified she was given electronic data files for six evidence items including a pistol, two dumbbells, a chair, coat, and T-shirt, along with reference DNA samples for M.C., L.C., and Appellant. *Id.* Ms. Bracamontes testified Appellant's DNA was found on all six items. *Id.* at 541-43.

After the Commonwealth rested, Appellant called Detective Kevin McCool of the Allegheny County Police Department to testify. *Id.* at 556. Detective McCool was questioned about finding mail belonging to a William Kelly in Apartment 9, to which he answered "I must have. I don't remember what or if it was a piece of mail, but at some point[,] I did come across that name, yes." *Id.* at 557. Detective McCool confirmed no police report was

---

[12] Under the Allegheny County Office of the Medical Examiner's forensic laboratory policies and procedures, a mixture of DNA of three or more contributors is too complex to interpret. *Id.* at 517.

drafted regarding the item, and no attempts were made to find or interview William Kelly. *Id.*

At the close of Appellant's trial, the jury convicted him of two counts of first-degree murder and one count of tampering with physical evidence. On July 11, 2024, he was sentenced to the term of incarceration set forth *supra.* Appellant filed a timely post-sentence motion on July 19, 2024. On July 25, 2025, new counsel was appointed for Appellant. On July 29, 2024, Appellant filed a motion for leave to file supplemental post-sentence motions and for an extension of time. On August 3, 2024, the trial court granted Appellant's motion. Appellant filed his supplemental post-sentence motion on September 4, 2024, and on September 13, 2024, the trial court denied it. Appellant filed a timely appeal on October 14, 2024.[13] The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement on January 4, 2025, and Appellant timely complied on January 7, 2025. On August 27, 2025, the trial court filed its Rule 1925(a) opinion.

On appeal, Appellant states the following two issues for our review, which we have reordered for ease of disposition:

---

[13] Appellant's 30-day appeal period ended on October 13, 2024, however as that was a Sunday, Appellant's notice of appeal filed October 14, 2024, is timely. *See* Pa.R.J.A. 107(b) ("Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation."); Pa.R.A.P. 107 (effective Jan. 1, 2024) ("In the construction of the Pennsylvania Rules of Appellate Procedure, the principles set forth in Pa.R.J.A. 104 to 115 shall be observed.") (footnote omitted).

I. Did the lower court err in denying [Appellant]'s motion *in limine* with respect to the testimony of [J.C.] … regarding the out-of-court statements purportedly made by [M.C.] … to [J.C.]…, offered for the truth of the matter asserted, insofar [as] they constituted hearsay under Pa.R.E. 801 and [Pa.R.E.] 802 and were inadmissible at trial?

II. Did the lower court err in finding that the guilty verdicts of first[-]degree murder and tamper[ing] with physical evidence were not contrary to the weight of the evidence based on the inherently unreliable identification evidence, lack of a motive[,] and absence of key evidence including the firearm used, as well as the fact that other males had access to the apartment?

Appellant's Brief at 4 (unnecessary capitalization omitted).

### *Hearsay Testimony*

First, Appellant argues the trial court erred in denying Appellant's motion *in limine* regarding the admission of J.C.'s testimony about her phone call with M.C. Appellant's Brief at 32.

Initially, we note that,

[t]he standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Young***, 989 A.2d 920, 924 (Pa. Super. 2010) (citation omitted).

Specifically, Appellant argues the trial court improperly admitted the following statements:

- 19 -

1. [T]hat … [M.C.] had called [J.C.] on February 15, 2023[,] between 6:00 a.m. and 7:00 a.m. and told her that [Appellant] had taken [M.C.] away the night prior and attempted to strangle her.

2. [T]hat [M.C.] told [J.C.] that [Appellant] was trying to choke and kill her while [L.C.] was in the car crying.

3. [T]hat [M.C.] had told [J.C.] on the morning of February 15, 2023[,] that [Appellant] had taken her car keys and would not return them.

Appellant's Brief at 32-33. Appellant argues these statements were inadmissible hearsay and did not fall within any exceptions. *Id.* at 32. Specifically, Appellant argues the state-of-mind exception under Pa.R.E. 803(3) is inapplicable, as

the statements allegedly made by [M.C.] to her mother [J.C.] perhaps tend to establish that [M.C.] was fearful of [Appellant]. However, the victim's state of mind was not a matter in issue in the case. It was the accused's state of mind, not that of the victim, which was material to establish the degree of guilt, if any, on the charge of criminal homicide.

Only when the declarations are considered for the truth of the matter asserted, that the night before the shooting, [Appellant] had driven off with [M.C.] and attempted to harm her, … that [L.C.] was in the car and was crying, and that the morning of the incident, [Appellant] had taken her car keys, do the declarations become relevant, that is, both material to and probative of an intent to kill. However, when considered for its substantive truth, the declarations, although relevant, are incompetent and hence inadmissible because they constitute hearsay not within any exception.

*Id.* at 35-36. Appellant surmises that "[e]ither these statements were relevant but inadmissible as hearsay without an applicable exception, or they were not hearsay, in which case they were irrelevant." *Id.* at 37.

In its brief, the Commonwealth does not dispute the statements are hearsay. However, it contends that, contrary to Appellant's argument, it did not rely on the state-of-mind exception to admit these statements. Commonwealth's Brief at 23. Instead, the Commonwealth maintains the statements "were admissible as excited utterances under [Rule] 803(2) or present sense impressions [under Rule 803(1)]." ***Id. See also*** Commonwealth's Response to Defendant's Motions *in Limine*, 11/1/23, at 8-16; N.T. Status Conference, 11/2/23, at 20-42; N.T. Trial at 7-10.

This Court has recently summarized:

> "Hearsay generally is inadmissible unless it falls within one of the exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence." ***Commonwealth v. Rivera***, 238 A.3d 482, 492 (Pa. 2020); ***see also*** Pa.R.E. 802 ([stating the] rule against hearsay). "Hearsay is a statement the declarant does not make while testifying at the current trial or hearing [and] is offered in evidence to prove the truth of the matter asserted." ***Commonwealth v. Fitzpatrick***, 255 A.3d 452, 471 (Pa. 2021) (citing Pa.R.E. 801(c)(1)-(2)) (ellipses and quotation marks omitted). "An out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement." ***Commonwealth v. Busanet***, 54 A.3d 35, 68 (Pa. 2012).

> Under the present sense impression exception to the rule against hearsay, a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it[,]" is admissible. Pa.R.E. 803(1); ***see also Croyle v. Smith***, 918 A.2d 142, 150 (Pa. Super. 2007) (stating [that] the present sense impression exception "permits testimony of declarations concerning conditions or events observed by the declarant regardless of whether the event was exciting[]") (citation omitted)[].

- 21 -

*Commonwealth v. King*, No. 608 WDA 2024, unpublished memorandum at 8-9 (Pa. Super. filed Mar. 21, 2025), *appeal denied*, No. 96 WAL 2025, 2025 WL 2600360 (Pa. filed Sept. 9, 2025) (emphasis omitted).[14]

This Court has further explained:

> The present sense impression exception, regardless of the availability of the declarant to testify at trial, allows the admission of a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. The observation must be made at the time of the event or shortly thereafter, making it unlikely that the declarant had the opportunity to form an intent to misstate his observation. Consequently, the trustworthiness of the statement depends on the timing of the declaration.
>
> The rationale for this exception is that the relative immediacy of the declaration [e]nsures that there will have been little opportunity for reflection or calculated misstatement. In addition, the present sense impression does not require that the comments be made to another person also present at the scene, but may be made over the telephone.

*Commonwealth v. Hood*, 872 A.2d 175, 183 (Pa. Super. 2005) (cleaned up). The panel in *Hood* concluded the trial court had properly admitted recordings of two 911 calls made by shooting witnesses under the present sense impression exception. *See id.* at 184. *See also Commonwealth v. Harris*, 658 A.2d 392 (Pa. 1995) (holding a victim's identification of the appellant's arrival at her door over a phone call was a clear example of a present sense impression exception to hearsay).

---

[14] Pursuant to Pa.R.A.P. 126(b), non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value.

Rule 803(2) of the Pennsylvania Rules of Evidence permits the admission of an excited utterance as an exception to the general rule that hearsay evidence is inadmissible. The Rule defines an excited utterance as: "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event." ***Commonwealth v. Cunningham***, 805 A.2d 566, 570 (Pa. Super. 2002).

According to Pennsylvania case law,

[f]or a hearsay statement to qualify as an excited utterance, the statement must be a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

***Commonwealth v. Upshur***, 764 A.2d 69, 75 (Pa. Super. 2000) (citations and quotations omitted). "[T]here is no clear-cut rule as to the time sequence required for a statement to qualify as an excited utterance, but rather [a] fact-specific determination is to be made on a case-by-case basis." ***Commonwealth v. Gray***, 867 A.2d 560, 570 (Pa. Super. 2005) (citing ***Commonwealth v. Pronksokie***, 383 A.2d 858, 862-63 (Pa. 1978)). "[T]he crucial question, regardless of time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance. It is the spontaneity of …

an excited utterance that is the source of reliability and the touchstone of admissibility." *Id.* at 570-71 (internal citations and brackets omitted).

In the instant case, the Commonwealth maintains "[i]t is clear from the content of the phone conversation between [M.C.] and [J.C.] that [M.C.] was contemporaneously relaying to her mother what events she was perceiving in real time, as well as events that occurred during the night that were volatile and exciting." Commonwealth's Brief at 21. The Commonwealth argues that "by the very fact that Appellant returned the car keys to [M.C.], Appellant verified his own identity as being present in the apartment; therefore, the surrounding circumstances confirmed what [M.C.] was relaying to her mother[,]" satisfying the present sense impression exception. *Id.* at 22-23. Additionally, the Commonwealth contends the statements also qualified for admission under the excited utterance exception:

> When [M.C.] and [J.C.] … talked early on the morning of February 15, 2023, this was the first opportunity [M.C.] had to explain the violent incident that happened on the roadside on the night before to anyone and Appellant was still present. She described a violent and startling event, and was still operating under the trauma, stating that she "never slept a wink" all night.

*Id.* at 27 (citing N.T. Trial at 122).

Upon review, we agree J.C.'s statements regarding what was said to her by M.C. on the morning of February 15, 2023, were properly admitted as exceptions to the hearsay rule under the rationale proposed by the Commonwealth. Specifically, the third statement raised by Appellant, regarding how Appellant had taken M.C.'s car keys and would not return them,

was admissible under the present sense impression exception to the rule against hearsay as set forth in **Hood** and **Harris**. It is clear M.C. was relaying her observation of events as they were happening, and the testimony that Appellant returned the keys to M.C. in response to J.C.'s yell over speakerphone further corroborated the trustworthiness of M.C.'s statement.

The other two statements raised by Appellant, set forth *supra*, fall within the excited utterance exception to the rule against hearsay under the standards of **Upshur** and **Gray**. Specifically, M.C. told her mother she did not sleep a wink after the events she described. **See** N.T. Trial at 122. This statement was supported by the Cellular Analysis conducted by Special Agent Orlando, which indicated M.C. was out with Appellant all night and did not return to Apartment 9 until approximately 5:06 a.m. **See id.** at 324-31. Additionally, the evidence at trial showed that at the time M.C. made these statements to J.C., she was still under the physical shock and stress of the events described. Namely: the missed calls between M.C. and S.C.; the spontaneity with which M.C. made her statement before J.C. could even inquire about why M.C. had not arrived to J.C.'s as expected; the change in M.C.'s tone compared to her usual tone as described by J.C.; and the evidence showing M.C. was in the ongoing presence of Appellant from the time of his assault until the time of the phone call.

As such, Appellant has failed to demonstrate the trial court abused its discretion in admitting J.C.'s testimony.[15]

### *Weight of the Evidence*

In Appellant's second issue, he contends the trial court erred by finding the guilty verdicts of first-degree murder and tampering with physical evidence were not contrary to the weight of the evidence, "given the lack of direct evidence connecting him to the crimes, the unreliable identification of his voice, the lack of any motive, … the fact that other males had access to the apartment, [that] DNA tests were compared to only three reference samples, and investigators failed to follow-up on other leads."  Appellant's Brief at 24.

Specifically, Appellant argues flawed DNA testing impaired the investigation.  To support his assertion the testing was flawed, he points to the fact that Sergeant Hahn's DNA was not present on the chair used to barricade the door despite video evidence he touched it.  *Id.* at 26.  Appellant further maintains the DNA evidence was not probative of guilt, as he resided

---

[15] We note the trial court's Rule 1925(a) opinion states "[t]he [c]ourt relied on *Commonwealth v. Mitchell*, 902 A.2d 430 (Pa. 2006)[,] in readying its decision."  Trial Court Opinion ("TCO"), 8/27/25, at 7.  *Mitchell* discussed the state-of-mind exception to the rule precluding hearsay regarding evidence showing the nature of a relationship between a victim and an appellant, as well as the victim's fear of the appellant.  *Mitchell*, 902 A.2d at 456.  To the extent that the trial court admitted J.C.'s statements under the state-of-mind hearsay exception, we note it is well settled "an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record." *Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012).

in the apartment and DNA testing cannot show at what point in time his DNA was left. *Id.* Appellant claims the gunshot residue is also not probative because it could have been transferred to Appellant's clothing by his prior handling of firearms or by police. *Id.* Appellant contends the paperwork in the apartment belonging to him indicates he likely intended to return, and the SIM card and car key in the toilet were indicative of someone attempting to point the finger at Appellant, as he had no reason to destroy them when the phone's records and car's registration would track back to him anyway. *Id.* at 27. Appellant further reasons the video footage and phone tracking at worst show his mere presence in the area, which is insufficient to establish guilt. *Id.* at 28. Appellant maintains other men had access to the apartment, as shown by the piece of mail with the name William Kelly on it, as well as the child custody form with the name Delrico Fletcher. *Id.* at 28-29. He also points out that one witness testified to seeing M.C. with two different men, and another witness claimed M.C.'s boyfriend's car was bronze when Appellant's was silver. *Id*. Appellant highlights J.C. had never spoken to Appellant on the phone, and argues the voice identification of the 911 caller was "so flawed as to render this evidence completely unreliable" for the reasons set forth *supra* during the testimony of Detectives Grimm and Bodnar. *Id.* at 29-31.[16] Appellant concludes that, based on all these reasons, the guilty verdict is "extremely shocking to one's sense of justice." *Id.* at 31-32.

_____

[16] We note that the record is absent of any attempt by Appellant to suppress the voice identifications based on the suggestive procedures alleged.

The Supreme Court of Pennsylvania has explained:

A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

***Commonwealth v. Cousar***, 928 A.2d 1025, 1035-36 (Pa. 2007).

Additionally, this Court has established that:

Moreover, when a weight challenge "is predicated on the credibility of trial testimony, [appellate] review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." ***Commonwealth v. Bowen***, 55 A.3d 1254, 1262 (Pa. Super. 2012). Any conflicts in the evidence or contradictions in testimony are exclusively for the fact-finder to resolve. ***Commonwealth v. Sanders***, 42 A.3d 325, 331 (Pa. Super. 2012). Finally, we note that, "[b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination [whether] the verdict is against the weight of the evidence." ***Id.***

***Commonwealth v. Wallace***, 244 A.3d 1261, 1276 (Pa. Super. 2021).

Here, in its Rule 1925(a) opinion, the trial court stated:

The jury verdict entered in this case does not shock the judicial conscience. Motive is not required to be proven by the

Commonwealth. … [Appellant] was the owner of a Glock 17 pistol which was not recovered, with the empty "Glock box" left at the crime scene. Projectiles recovered at autopsy were consistent with having been fi[r]ed from a Glock. None of the identification evidence was inherently unreliable. The [trial c]ourt closely reviewed all the evidence and testimony presented to the jury. ***Commonwealth v. Henry***, 283 A.3d 391 (Pa. Super. 2022). The jury considered the evidence presented in this case and found … [Appellant] guilty.

TCO at 7-8.

The sum and substance of Appellant's argument is a challenge to the credibility and weight attributed to the testimony and evidence presented at trial. The Commonwealth correctly notes that "these discrepancies were used by defense counsel at trial to discredit the Commonwealth's case before the jury" and "Appellant's arguments now are the very arguments relied upon by defense counsel before the jury." Commonwealth's Brief at 12-13. ***See also*** N.T. Trial at 575-87. Where defense counsel raised each of these issues through cross-examination, the presentation of his own witnesses, and through his closing argument, the jury was free to believe or not believe the evidence and testimony presented by the Commonwealth. We cannot accept Appellant's request to substitute our judgment for that of the jury. ***See Commonwealth v. Champney***, 832 A.2d 403, 408 (Pa. Super. 2003) ("The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witness[es]. An appellate court cannot substitute its judgment for that of the finder of fact.").

Accordingly, the trial court did not abuse its discretion in denying Appellant's post-sentence motion for a new trial based on his challenge to the weight of the evidence, or in admitting J.C.'s testimony regarding her phone call with M.C.

Judgment of sentence affirmed.

Lazarus, P.J., joins the Memorandum

Stabile, J., Concurs in the Result

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  6/15/2026